Wally Trujillo served in this country for 22 years, and his record of service is blemish-free. In September of 2007, Mr. Trujillo made a mistake. He authorized the purchase of a $780 barbeque for use by his staff at the aircraft hangar in Laredo, Texas, and because he wasn't a member of the Air Force, he was forced to leave the country. He wasn't certain that that purchase would be approved. He had it described as a heating element-slash-document incinerator. He made several mistakes. He had somebody else instructed an employee. I'd note, Your Honor, that the employee's role here was really nothing more than a scrivener. The employee wasn't sanctioned or penalized for his role in this. The evidence at the hearing level was actually contradictory about whether or not Mr. Trujillo had instructed the employee, hey, put up the form, and then Mr. Trujillo typed it in, or as the administrative judge found, that Mr. Trujillo handed the employee a note and said, hey, type this into the form, I'm going to sign it and submit it. So yes, there was some involvement of an employee, but again, I think the role was really just that. And the role of the employee is subordinate to Mr. Trujillo? Yes. So if Mr. Trujillo instructs his subordinate to make a false entry, I mean, you know, boy, isn't that kind of tough for the subordinate? The subordinate at that point has two possibilities, right? Refuse to make it and possibly make his supervisor really angry, or go ahead and make it. I know it seems worse when you make somebody else complicit in your misrepresentation. I think that's correct, although again, I think it was really sort of more as this employee simply is the person who has physical control over the document versus makes any judgment calls. I don't think that the employee was in any position where he would, no matter what a supervisor said to put into it, I don't think that the employee makes an independent judgment call. Well, that's an accurate description or an inaccurate description. I don't think that that's the situation here. Would the employee here have had any basis for knowing that perhaps it was not a correct description? The employee here did, in fact, have a basis for knowing that it was not, in fact, a correct description because the employee went out and purchased the barbecue. So the employee knew, I don't know if it was at the time or after the fact, but at some point the employee became aware, and in fact the employee, along with the rest of the folks at the hangar, liked the barbecue, used the barbecue, and burned documents in the barbecue. Of course, I'd like to put one right out in our courtyard. I think it would be awesome, but we can't unless it's an approved purchase. There are lots of ways in which I'd like to use the government's money to improve morale around here. Sequestration and other issues, that's definitely off the table. Well, that's correct. There was some indication here that Mr. Trujillo at least made some effort to try and figure out could this be approved in advance. First of all, I think the setting is a bit different, that there was already a barbecue that was not quite functioning. You're correct. I mean, there's no question this was passed up. As I understood the record, there was a certain amount of conversation back and forth about the fact that he'd like to get a new barbecue, and the question is, well, I think they'll approve it up in Illinois or wherever it is you've got to go get approval for it, but I'm not really sure. I hope so. Well, that's a fact of life. And then they say, well, maybe what I'll do is I won't apply for that. I'll apply for a heating element with document destruction. I think that's exactly right. I mean, he spoke to a number of the procurement folks and said, hey, this is, and internally said, this is what I want to do. I think this would be a good thing for morale, and I'd like to get it as a side use. We can burn some of our documents in it, and the procurement people respond. He's particularly unsafe, by the way, in any event. Well, I know. Especially on the barbecue. I don't know what the fire warnings are there, but I know here yesterday we certainly had one. I don't know. You know, he did make some effort to reach out to the procurement people, and they said, well, it seems like it would be okay. Contact this other procurement specialist who was not particularly competent or helpful, and so he sort of, he took matters into, again, we don't dispute that there was poor judgment here. I mean, he sort of took matters into his own hands and said, well, if I call it a heating element slash document incinerator, it's probably going to evade scrutiny, and there won't be a problem. And his judgment was, which was poor judgment. Your best argument, it seems to me, is your argument that the penalty is just disproportionate to the crime. Well, I think that's true. I mean, I think it is. I'll tell you that right now. Hands down, I think it is. I don't think this guy should have been fired for this. I think it was a critical mistake, maybe take away authorization authority, whatever. The problem, the biggest problem that we have in these cases is our standard of review. Our standard of review is minuscule. I mean, we have to give so much deference. Only if the penalty was arbitrary, capricious, and unreasonable can we overturn it. And, you know, given that the supervisor is saying, well, I can't trust him anymore, and this is part of his job, and his job is sort of trust is a critical component of it. That makes it a lot harder for me to say, oh, come on, give the guy a break. He ordered a barbecue. Well, give the guy a break. This is, you know, when you… It's not a case of first impression. When you say it to somebody, this guy bought a $780 barbecue, after 22 years of service, he's not somebody that should have been fired. And there's no question the agency has tremendously broad discretion, but it's not unfettered. I mean, the agency still has to engage in the Douglas factor analysis. And I think that what happened here, if you look at the record, is that the agency determined, you know, their table of penalties that were available, first-time offense for a falsification charge, written reprimand to removal. So they're heading, based on this set of facts, they're going to head for that final removal stage. And some of the rationale makes no sense. Yeah, but there are innumerable cases where first offense, where you can go from a reprimand to removal, they go removal, and things we haven't done about it. The thing that puzzled me here was that while this potential for a penalty was going on, there were discussions of a settlement. And there were discussions of a settlement, and even including, I don't know what rank he was in, but he was going to be offered a GS-14 in the headquarters in Washington or a GS-13 in Laredo or someplace closer than that. And that all falls apart. That all fell apart. And I was not counsel at that point in the case, but my understanding is that the parties, perhaps through their counsel, got a little bit entrenched in some language that fell apart in the settlement discussion. But I would note that, again, going back to just this issue about, is this a situation where? One of the very exceptional and rare situations where the penalty is wholly unwarranted and is capable of being reviewed by this court. But the government, I mean, they did everything right on the Douglas factors. Everything is in evidence. They marched through them, and they focused so much on the supervisor that I can't trust them anymore. And let's be honest, Mr. Trujillo is not a spotless employee. As he sort of alleged, he misused a government camera to take naughty pictures of somebody. I mean, there are other things in this record which seem to be part of his employment history. Now, maybe he wasn't penalized for it. It wasn't. I don't believe it was even sustained. I mean, there was a different investigation that sparked this finding into the barbecue issue. So there was some other investigation there. And that's where I think what was relevant to that is that that's why the agency was so intent on reaching the removal. It wasn't for this conduct. Perhaps it was for other conduct. Perhaps it's because in the settlement discussion, Mr. Trujillo failed for whatever reason to accept what they viewed to be a completely reasonable and generous offer, and in a way to penalize him said, well, we're going to remove you then. And I think one of the Douglas factors and the one that I personally find most disturbing here is that the deciding official says, well, he exercised poor judgment here in misrepresenting what this purchase really was. And as a result, I don't think I can trust his judgment to fly an aircraft. That is apples and oranges. I mean, it is unreasonable for the deciding official to think that using poor judgment in this procurement issue might cause Mr. Trujillo to exercise poor judgment in the operation of an aircraft, which he's been doing for 22 years. So I think some of the other problems with the Douglas factors is that the deciding official also failed to consider relevant factors. He did not take into consideration seven years of military service. So there is… What do you mean he didn't take into consideration? It was part of the record. You mean he didn't expressly mention it in the decision? No, he expressed to the contrary. He said, I'm crediting him. I know he's been here for 15 years. I'm taking that length of service into consideration. Well, that was incorrect. He actually, if you take his military service into consideration, there were 22 years of service that should have been taken into consideration. So close to a third of his time with the federal government was completely disregarded by the deciding official. And perhaps if the deciding official had correctly taken into consideration the fact that this is somebody who served our military, that might have been something to cause him to mitigate the penalty to something that was reasonable. The deciding official was clearly aware of the prior military service. He wasn't. Or at least he was made aware of it, but he didn't consider it at the very minimum. And at the hearing he, and this is noted in the administrative judge's findings, the deciding official only credited Mr. Trujillo with 15 years of service when, in fact, it should have been 22. So there is an error. The question is, though, is that error enough for us to conclude that the penalty was completely unreasonable? I think, you know, I mean, go back. I don't think the deciding official would have ever made a different decision if it was 15 versus 22 years of service. I mean, that seems like a mistake and a difference. But the idea that he would have made, therefore, at least the conclusion that the penalty is unreasonable. I don't know if that alone would do it. I do think the deciding official here was clearly struggling with his decision because part of his testimony was, well, if one charge and not the other was sustained, I might have done something differently. And for an extended period of time he was looking at demotion options. But both charges were sustained, so that's off the table. Well, I think that brings me to the merger issue. I think the charges should have been merged. But even if they're merged, they're still two charges. I mean, merging them doesn't change the gravity of what he did. It doesn't change the gravity of what he did. That's correct. And also it doesn't mean the AJ, the deciding official then, I should say, would have reached a different conclusion. What I understood him to say was, well, if you didn't involve another employee, for example. You know, merging the two charges doesn't change what happened. It doesn't. And in most instances I would agree that a merger of the charges would not, would potentially and usually probably not result in a different sanction where it's the more serious of the two charges that is sustained. However, the evidence in this case is a little bit unusual in that the deciding official testified that if there were only, it seemed to influence the deciding official, the number of charges. He sort of acknowledged that this is all just one big falsification and it seems like it's all kind of related. And then when pressed and said, well, what would you do if just charge two, which was the more serious of the two, the one that involved the employee. What would you do then? Well, I think it could be 30 days. Well, what if it was just charge two? Three. Well, then it could be 90 days. In other words, there was some indication here that the deciding official was, in fact, influenced by the number of charges that were present. So merger could very well in this case have made a difference for Mr. Trujillo. You're into your rebuttal time. You can keep going, but it's your time. I'm sorry. Do you want to reserve the rest? I will indeed. Thank you. I'll give you your two minutes back. Mr. Sweet. May it please the Court, I'll begin with the penalty since that seems to be the Court's primary concern. The penalty or remover in this case, while at first blush may seem harsh, was not so harsh as to be totally unwarranted. This was an intentional and a deceptive act. Moreover, it was serious in that it involved forcification, which called into question Mr. Trujillo's trustworthiness. But not his trustworthiness to fly a plane. Well, I think his trustworthiness, his willingness to follow procedure, and his judgment all have a bearing on his reliability, his trustworthiness, his willingness to follow procedure, and his judgment in executing law enforcement functions. I don't think that he... What does that have to do with flying a plane? If he's not willing to follow procedures, I think then there's a risk that... Because he bought a barbecue, he's going to do what with a plane? Well, he might not follow agency procedures. It's not just that he's dealing with a plane. Which ones are in jeopardy because of the barbecue? I'm sorry? Which procedures are we legitimately saying he is unlikely or possibly unlikely to follow because he bought a barbecue? It's possible he could not follow any agency procedure. Any agency procedure. It's possible he might not employ safety conditions in the course of flying his aircraft. Well, it's not just that he's flying an aircraft. He's a law enforcement official. I think the government is warranted in concluding that when you're giving this much discretion and power over people with law enforcement officials, that you want to hold them to a high level of judgment, and that you want to make sure that they're not willing to engage in deception to avoid procedures. So I do think that it has bearing on his reliability and his judgment as a law enforcement official. It also was not totally unwarranted because Mr. Trujillo was a supervisor. Not only a supervisor, but he was the director of air operations of this base. I just find it strange that the agency has decided that this person is so thoroughly untrustworthy and needs to be removed, yet at the same time the agency would have been happy to bring him to Washington as a GS-14 to work in the headquarters. So you bring a person that is untrustworthy, you cannot rely upon them, and you bring them to the headquarters of the Department of Homeland Security and turn them loose. Well, if he were to be brought to accept a depulsion, he would be under a last chance agreement, pursuant to which there would be some safeguards against any improper conduct. But he wouldn't have been fired. Right, but if he engaged in anything else, they would have the ability to revoke the penalty. So he wouldn't just be out there on his own. It struck me as a disconnect. Given the facts of this case, where you have a situation where there was an existing outdoor cooker of some sort that was there for the morale and benefit of the people that he was dealing with, that it needed to be replaced, there was really nothing evil going on. There was a desire to somehow deal with the red tape up at headquarters. I'm having trouble getting my hands on the magnitude of the penalty here in the light of the offense. Coupled with the fact that the agency was delighted to have him down in Laredo enforcing the border the next day, if he had been willing to say so. Well, again, he would be subject to a last chance agreement if he did that. And in terms of his intent, I absolutely agree, he did not have an evil intent. But that doesn't change the fact that he was willing to falsify documents and engage in a ruse in order to get something that he wanted. In your view, why did the settlement negotiations fall apart? Again, I apologize, I wasn't the attorney of record at that point. I mean, from reading the record, my understanding is there was some issue as to whether or not he would be willing to accept a position in Washington versus Laredo, but again, I wasn't party to that thought. So the government was considering settlement at one time, and is that off the table? Yeah, I think that there was a deadline that was set that he didn't respond to by, and I believe that was off the table. Why should we not order mediation or some sort of settlement in this case? Your Honor, this case has been around for a long time. Okay, we have something that we're willing to consider here. How about if we withhold, you know, it seems like neither of you were involved in settlement, but settlement was very clearly within grasp of the last set of attorneys who pig-headedly didn't do it for whatever reason. Why don't we order you all to mediate? If you cannot reach a settlement, we will decide the case. No further action will be necessary in the way of oral argument or otherwise, but we have a mediation counsel here. I mean, it doesn't cost you anything to mediate. I imagine if you're not local, they could even do it over the phone. I know they've done that before, probably in your client's interest, if you could possibly be here for it, but would the government refuse or be completely adverse to that concept? I would ask if I could discuss that with the agency counsel. Frankly, I haven't addressed that issue with them, and, you know, I just can't speak off the cuff with them. We have the authority to order you to mediate, certainly, but if you're going to stand here and tell me, order us to mediate, I'll show up, stand there, and waste your time. I can't say that. I just apologize. I can't answer right now, and I would ask if the court is inclined to do that. This is a courtesy to the government in a way. I mean, we're going to withhold issuing our decision for a period of time, 30 days or whatever. You know, you might not like the decision if we decided to issue a day after tomorrow. So that's a little signal to you that maybe the government ought to think a little bit about settling this case. Yeah, I haven't ordered mediation before, so, you know, take what you want from that. You know, I think you've been here for the whole oral argument. We're not saying you're going to lose, for sure. We're saying that there seems to be something more here and that you all seemed close to settlement in the past, and maybe some stupid and pig-headed decisions were made that prevented that from occurring. And maybe it's possible that you could alleviate our workload a little bit with this case. I hear you, Your Honor, and I just don't have authority to mediate. I just want to make clear that that is the case from your perspective. Go ahead, you do it. Why don't we leave it at this, that the court will suspend further proceedings in this case for 30 days, and within 30 days, and by the 30th day from today, we'd like a report from both you and the other counsel telling us what the status is of any possible discussion. With the understanding that our mediation office is available and willing to mediate this claim, if that's necessary, or if you can settle otherwise without incorporating them, that's great too. I don't know if I need to clarify a statement of what my fellow colleague, Judge Claringer, but I just want to make it clear that it's not a guarantee that you're going to lose. It could go one way or the other, but it's not a guarantee that you're going to lose. I understand. Thank you, Your Honor. By my hesitation, I don't want to leave the impression that I don't appreciate the opportunity. It's just I can't agree to it standing here. You may well report to us in 30 days that you've been unwilling or unable or whatever it is, and we'll decide what to do after that. Thank you, Your Honor. You have seven minutes left. If you want to try and argue some more, go for it. No, I mean, I think Your Honor has made yourself clear. Do you really have anything else you feel like you want to say? If I were you, I wouldn't say a lot, but if you feel like you need to come out and talk, go ahead. I've wanted mediation since I stepped into this case, so we're delighted to attempt mediation on behalf of the appellant. I'm local. He's not, so I'll be there on his behalf, and if he can come in, I know he will. A reasonable mind should prevail. I'm sorry. May I clarify? So you just issued an order saying 30 days? We're not doing anything. We're staying. We're just going to stay the case for 30 days. We're not going to force you to mediate, because if you go back and your superiors say, uh-uh, not going to happen, we're not stepping foot in that, I don't want to waste anybody's time, but we're going to give you 30 days to take into account everything we discussed today and see if there's any way that you all would be open to the possibility of working this out. Okay, and within 30 days, you should expect a report one way or another? We should expect an update from both of you on the 30th day. Not a brief, nothing like that. You're going to mediate or we're not going to mediate? No, or we've settled already, we're going to mediate, please continue to stay, or we're at an impasse, please decide our case. Okay, understood. Thank you. Thank you. The case is submitted. Thank both counsel. I think we're done here. All right. What would I do without you guys?